952 F.2d 404
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Garry JENKINS and Garry's Pharmacy, Inc., Defendants-Appellants.
 No. 90-6561.
 United States Court of Appeals, Sixth Circuit.
 Jan. 15, 1992.
 
 Before RYAN and ALAN E. NORRIS, Circuit Judges; and BELL, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Garry Jenkins and Garry's Pharmacy, Inc. appeal their jury convictions for illegal distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and Medicaid fraud, in violation of 42 U.S.C. §§ 1396h(a)(1) and 1320a-7b(a)(1). Although defendants raise several issues on appeal, we need only resolve one, because on that issue we find that the district court erred to the substantial prejudice of the defendants, and on that ground we reverse their convictions and remand the case for a new trial. We therefore reach only the following issue:
 
 
 2
 Whether the district court erred by allowing the United States to introduce facts relating to Jenkins' prior pretrial diversion agreement during its cross-examination of Jenkins?
 
 
 3
 We conclude that the district court erred by allowing the government to inquire into the pretrial diversion agreement during its cross-examination of Jenkins, and that defendants were, as a result, denied a fair trial. We therefore reverse defendants' convictions and remand the case for a new trial.
 
 I.
 
 4
 Garry Jenkins was the owner and chief pharmacist of Garry's Pharmacy in Salyersville, Kentucky. He and the pharmacy were brought to trial for illegal distribution of controlled substances and Medicaid fraud. The first eighty-six counts of the indictment charged the defendants with distributing 7057 units of controlled substances to identified individuals on specific dates, without proper medical authorization. The next nineteen counts charged them with illegally distributing another 205,673 units of controlled substances to unknown individuals at some time between June 19, 1987 and September 8, 1988. The remaining eighty-two counts charged defendants with specific acts of Medicaid fraud.
 
 
 5
 Several of the Medicaid fraud counts related to conduct that occurred while Jenkins was suspended from participation in the Medicaid program. This suspension resulted from a pretrial diversion agreement between Jenkins and the government in an earlier and unrelated case. In that case, the government alleged that Jenkins had filled prescriptions for name brand drugs with generic brands and then fraudulently billed Medicaid for the name brand drug, thus reaping an unearned profit. In exchange for the government's promise, ultimately, to drop its prosecution on these charges, Jenkins agreed to accept a thirty day suspension from Medicaid beginning on October 26, 1988.
 
 
 6
 Under this suspension, Jenkins could continue to fill prescriptions but could not bill Medicaid for them. Several counts of the indictment in this case charged that rather than accept a loss on these prescriptions or tell his customers that he would not fill their prescriptions, Jenkins partially filled the prescriptions on the basis of the customers' needs during the time period of the suspension. He then instructed them to come back for the remainder of their prescriptions after the suspension period had expired. Although he did not bill Medicaid for the partial distributions he made during the suspension, he did bill Medicaid for the partial distributions he made after the suspension. Upon billing Medicaid for these partial distributions, Jenkins stated that he filled the prescriptions according to the doctors' orders, when in fact he had not done so because the doctors' orders had called for full distribution during the period of the suspension. The government alleged that this conduct amounted to making false statements to Medicaid.
 
 
 7
 It was essential, therefore, that the government establish that Jenkins had been suspended from participating in Medicaid, in order to prove the false statement counts. Although Jenkins recognized that evidence of his suspension was admissible for this purpose, he moved in limine to prevent the government from introducing evidence regarding the details that gave rise to the suspension, including the existence and nature of the pretrial diversion agreement.
 
 
 8
 During the hearing on Jenkins' motion in limine, the Assistant United States Attorney orally stipulated that such evidence would not be introduced. In response to a question by Jenkins' counsel asking whether the government agreed that only the fact that Jenkins was suspended and not the facts behind the suspension would be introduced at trial, the Assistant U.S. Attorney responded, "I don't have a problem with that. It is already in the record." In light of this stipulation, the court granted Jenkins' motion in limine. The court's order provided:
 
 
 9
 [T]he motion of the defendant in limine to prohibit the introduction of evidence of other crimes, wrongs or acts is GRANTED to the extent that the United States shall not introduce evidence of acts which caused the defendant to be suspended.
 
 
 10
 During the trial, the government presented two principal types of evidence. On the specific counts of illegal controlled substance distribution and Medicaid fraud, it introduced Jenkins' records concerning several refills that had been made of prescriptions that were marked "no refills." The government then presented the testimony of the physicians whose names appeared on these "no refill" prescriptions. These physicians testified that they had not authorized any refills and were unaware that their patients had been receiving more drugs than they had prescribed.
 
 
 11
 On the remaining counts of illegal substance distribution, the government introduced evidence of a significantly different nature. It presented Jenkins' records of drugs received from wholesalers, prescriptions filled, and an audit of the drugs in his possession. Coupled with the lack of any evidence demonstrating the lawful distribution of these drugs, the government used this evidence to show a substantial unexplained shortfall in Jenkins' inventory.
 
 
 12
 Jenkins testified that the prescribing physicians had authorized the refills over the telephone. He further testified, and this is critical to our decision, that he had not intentionally violated any known law during the period of the indictment. After Jenkins' direct testimony, the government informed the court that it was going to use the pretrial diversion agreement to impeach Jenkins on his statement that he had not intentionally violated any known law during the period of the indictment. The defense objected, arguing that the pretrial diversion agreement concerned acts that occurred before the period of the indictment and therefore provided no grounds for the contradiction of Jenkins' statement. The court overruled the objection and permitted the government to cross-examine Jenkins on the pretrial diversion agreement.
 
 
 13
 The court stated that it would permit the prosecutor to read part of the diversion agreement and to ask Jenkins whether he had signed it. The court also said it would permit the prosecutor to include the dates of the investigation in her question, although the dates did not appear in the agreement itself. Following these rulings, the prosecutor asked Jenkins on cross-examination whether he had signed a pretrial diversion agreement with the government that provided:
 
 
 14
 It appearing that you are reported to have committed an offense against the United States in violation of Title 42, United States Code, Section 1396 and Title 18, United States Code, Section 1341, in that you did submit to the Kentucky Medicaid Program claim forms for payment which contained false statements during the time period of January 1, 1982 through December 31, 1986, and upon accepting responsibility for your behavior and by your signature on this agreement, it appearing, after an investigation of the offense, and your background, that the interests of the United States and your own interests and the interests of justice will be served by the following procedure; therefore, you will be put in deferred prosecution for a period of 12 months from this date, providing you follow set conditions of the program.
 
 
 15
 Jenkins admitted that he had signed this agreement.
 
 
 16
 The jury found Jenkins guilty on 105 counts of the indictment, and Garry's Pharmacy, Inc. guilty on 107 counts of the indictment.
 
 II.
 
 17
 Jenkins argues that the district court erred in allowing the government to introduce the facts behind his prior suspension from Medicaid during its cross-examination of him. During the pretrial hearing on Jenkins' motion in limine, the government agreed that it would limit its evidence of Jenkins' Medicaid suspension to the simple fact that Jenkins had been suspended and would not introduce evidence of the facts behind that suspension. Based upon this agreement, the district court granted Jenkins' motion in limine "to the extent that the United States shall not introduce evidence of acts which caused the defendant to be suspended." Jenkins suggests that his decision to waive his right to remain silent and to testify in his own defense was made in reliance on the government's agreement not to introduce such evidence.
 
 
 18
 The government acknowledges this agreement but contends that it did not use the facts behind the suspension as substantive proof that Jenkins was guilty of Medicaid fraud, but only to impeach Jenkins after he had testified on direct examination that during the period covered by the indictment he had not knowingly or intentionally violated any law. The government's argument is that the pretrial stipulation indeed prohibited it from using the factual basis for the suspension to prove the elements of its case but did not prohibit it from using those facts to impeach Jenkins' credibility. Moreover, the government contends, Jenkins opened the door to this line of questioning by making a false statement on direct.
 
 
 19
 Although Jenkins was entitled to rely on the government's stipulation that it would not introduce the facts behind his suspension, he was not free to testify falsely about such matters and then expect the court to preclude the government from impeaching him with evidence of acts or statements contradicting his testimony. Accordingly, the government argues that the district court did not err by allowing it to introduce the pretrial diversion agreement because that agreement contradicted Jenkins' direct testimony. This argument, however, is based on the conclusion that the diversion agreement in fact contradicted Jenkins' testimony. We find that it did not.
 
 
 20
 The government argues that the pretrial diversion agreement contradicted Jenkins' statement because it demonstrated that he knew prescription splitting was illegal and therefore he could not truthfully testify on direct that he did not intentionally violate any known law. But such an argument is unavailing, because the conduct alleged with respect to the pretrial diversion agreement was not at all related to prescription splitting, the conduct for which Jenkins was on trial. The pretrial diversion agreement concerned allegations that Jenkins had filled prescriptions with generic drugs and billed Medicaid for brand name drugs. Thus, even if the diversion agreement was evidence that Jenkins understood the illegal nature of billing Medicaid for more expensive drugs than he actually dispensed, that knowledge would not necessarily make him aware of the illegal nature of prescription splitting. Thus, the pretrial diversion agreement was not properly used to impeach Jenkins' direct testimony.
 
 
 21
 We hold that the district court committed reversible error by allowing the government to cross-examine Jenkins on the pretrial diversion agreement, in the manner it did, when the government had agreed before trial that it would not introduce that evidence. See United States v. Shapiro, 879 F.2d 468, 472 (9th Cir.1989), superseding 868 F.2d 1125 (9th Cir.1989). Moreover, we cannot say that introduction of the pretrial diversion agreement was harmless error. It branded Jenkins as both a liar and a recidivist. Because Jenkins' defense rested to a large extent on his own credibility, introduction of the pretrial diversion agreement was substantially prejudicial to that defense and cannot be considered harmless.
 
 
 22
 We further hold that should the government decide to retry Jenkins, it will remain bound by its agreement not to introduce evidence of the facts behind Jenkins' suspension from Medicaid, including the existence and nature of the pretrial diversion agreement.
 
 III.
 
 23
 For the foregoing reasons, we REVERSE defendants' convictions and REMAND their case for a new trial in conformity with the holding of this opinion.